**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re<br><br>ROBERT S. CRAWFORD, JR. and<br>ROSEMARIE CRAWFORD,<br><br>　　　　　　　Debtors<br><br>JOSEPH BRAUNSTEIN,<br>　CHAPTER 7 TRUSTEE,<br><br>　　　　　　　Plaintiff<br><br>v.<br><br>ROBERT S. CRAWFORD, JR. and<br>MARK KAMPHAUS,<br><br>　　　　　　　Defendants | Chapter 7<br>Case No. 08-18764-FJB<br><br><br><br><br><br>Adversary Proceeding<br>No. 09-1063-FJB |

**MEMORANDUM OF DECISION ON ACTION**
**TO AVOID TRANSFER OF PROPERTY AS FRAUDULENT OR PREFERENTIAL**

By his complaint in this adversary proceeding, the chapter 7 trustee, Joseph Braunstein (the "Trustee"), asserts a claim under 11 U.S.C. § 548(a)(1) for recovery of real property that the chapter 7 debtor, Robert Crawford ("Crawford"), conveyed to his former business associate, Mark Kamphaus ("Kamphaus"), which transfer the Trustee contends was constructively fraudulent. As an alternative basis for recovery of the property, the Trustee asserts that the transfer is a voidable preference under 11 U.S.C. § 547(b). The court held a trial at which three witnesses testified: the Debtor, Kamphaus, and Wesley Rickard, a licensed CPA who performed work relating to the taxation of an LLC that the Debtor and Kamphaus created. Following are the findings of fact and conclusions of law required by FED. R. BANKR. P. 7052.

**Facts**

In August 2004, Crawford and Kamphaus entered into a business relationship with the intent of purchasing, developing, and selling real property for profit (the "Project"). In furtherance of the Project, Crawford and Kamphaus purchased and, by deed dated August 5, 2004, took title to three parcels of real property, located at 339, 343, and 349 Poplar Street in Boston (collectively the "Properties"), for total consideration of $350,000.00. As evidenced by the deed, Crawford and Kamphaus took title to the Properties as joint tenants in their individual capacities. Although they later formed a limited liability company, known as Kampford LLC, through which to conduct their business of developing the Properties, they took title to the Properties in their own names, as joint tenants, and never transferred title to the LLC. Regarding their respective roles in the Project, it was the Parties' understanding that Kamphaus, an investment banker, would provide the majority of the capital and his financial expertise, while the Debtor, a carpenter by trade, would oversee the actual construction, including the hiring of subcontractors.

In order to finance the purchase and development of the Properties, Crawford, Kamphaus, and Crawford's wife, Rosemarie Crawford ("Rosemarie"), borrowed $1,000,000 from Industrial Credit Union ("ICU") and, to secure this loan, granted ICU a mortgage on the Properties.[1] In addition, Kamphaus personally funded the entirety of the $61,264 required down payment on the Properties.

On June 23, 2005, the Parties executed an agreement, entitled Kampford LLC Operating Agreement, to govern a limited liability company they were thereby forming, to be known as Kampford, LLC ("Kampford"). They filed a certificate of organization for Kampford with the Massachusetts Secretary of State on July 12, 2005. According to Crawford's and Kamphaus's testimony, they established Kampford in order to keep track of the profits and losses and tax issues associated with their development of the Properties. Kampford never held title to any of the Properties, and the Deed by

---

[1] Although Rosemarie was an obligor on the loan and signed the mortgage, she was not a party to the Crawford/Kamphaus business venture, and she had no interest in the Properties.

2

which Crawford and Kamphaus took title to the Properties made no mention of Kampford. The

Kampford Operating Agreement provides in relevant part regarding Capital Accounts:

> For each Member . . . the LLC shall establish and maintain a separate Capital Account. It shall reflect each member's capital contribution to the LLC, increased by each member's share of profits in the LLC, decreased by each member's share of losses and expenses of the LLC, and adjusted as required in accordance with applicable [IRS] provisions.[2]

Paragraph 3.02 of the Operating Agreement sets forth the guidelines pertaining to the Parties'

respective capital contributions to Kampford as follows:

> (a)  Each member has contributed to the capital of the LLC the amount set forth opposite its name on Schedule A attached hereto.
>
> (b)  Members shall not make additional capital contributions, other than as may subsequently be agreed upon by the Members. In which case, this Agreement shall be amended in writing to reflect the additional contributions and any change to the percentage interests, if any, of the Members.
>
> (c)  Upon liquidation of the Manager's interest in the LLC (including upon liquidation of the LLC), the Manager shall contribute to the capital of the LLC an amount equal to his negative Capital Account balance, if any.

The Operating Agreement names both Kamphaus and Crawford as managers of Kampford.

Regarding what was to occur upon the dissolution of Kampford, the Operating Agreement

provides in paragraph 9.03:

> Dissolution of the LLC shall be effective on the day on which occurs the event giving rise to the dissolution, but the LLC shall not terminate until its Certificate shall have been canceled and the assets of the LLC shall have been distributed as provided herein. Notwithstanding the dissolution of the LLC, prior to the termination of the LLC, as aforesaid, the business of the LLC and the affairs of the Members, as such, shall continue to be governed by this Agreement. The remaining Manager or, if there be none, a liquidator appointed with the Consent of the Members, shall liquidate the assets of the LLC, apply and distribute the proceeds thereof as contemplated by this Agreement and cause the cancellation of the Certificate.

---

[2] Operating Agreement, ¶ 3.01.

The Agreement at paragraph 9.04 sets forth the provisions governing distributions upon liquidation as follows:

> (a) After paying liabilities owed to creditors, the Managers or such liquidator shall set up such reserves as it deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the LLC. Said reserves may be paid over by such Managers or such liquidator to a bank, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as such Managers or such liquidator may deem advisable, such reserves shall be distributed to the Members or their assigns in the manner set forth in paragraph (b), below.
>
> (b) After paying such liabilities and providing for such reserves, the liquidator shall cause the remaining net assets of the LLC to be distributed to all Members with positive Capital Account balances . . . in proportion to and to the extent of such positive balances. In the event that any part of such net assets consists of notes or accounts receivable or other non-cash assets, the liquidator may take whatever steps it deems appropriate to convert such assets into cash or into any other form which would facilitate the distribution thereof.

Kamphaus testified at trial, concerning his understanding of the aforementioned provisions of the Operating Agreement, that "the agreement said that if one member of the LLC had a negative capital account that all the assets would turn over to the other member with a positive capital account." Accordingly Kamphaus believed that the transfer of 339 Poplar Street, the subject of the Trustee's current avoidance action, occurred pursuant to the Operating Agreement.

Schedule A to the Operating Agreement states that Crawford and Kamphaus each held a 50% interest in Kampford. Notwithstanding paragraph 3.02(a), Schedule A does not indicate the amounts of Crawford's and Kamphaus's respective Capital Contributions. Based on the testimony of both Crawford and Kamphaus, the Court finds that Crawford and Kamphaus agreed to share profits and losses equally.

According to Kampford's 2005 tax return, the LLC incurred a loss in 2005 of $2,522. In addition, notwithstanding that the properties were owned jointly by Crawford and Kamphaus in their individual capacities, Kampford's 2005 tax return lists the Properties as assets of the LLC. On Schedule K-1 to his

4

2005 federal income tax return, concerning his interest in Kampford, Crawford indicated that he contributed $25,000 in capital to Kampford during 2005, approximately 5.35% of Kampford's total capital, and incurred a loss of $1,261, half of the total loss that Kampford incurred in 2005. On Kamphaus's 2005 Schedule K-1, concerning his interest in Kampford, Kamphaus indicated that he contributed $420,975 in capital during the year, approximately 94.65% of Kampford's total capital, and that he incurred a loss of $1,261, half of the total loss that Kampford incurred in 2005.

On August 15, 2006, Crawford and Kamphaus, as joint tenants, sold and conveyed title to the first of the three Properties, 349 Poplar Street, for the stated consideration of $600,000. Of that $600,000, Crawford and Kamphaus used approximately $400,000 to reduce the balance on the $1 million ICU loan. Kamphaus retired the balance of the loan, approximately $600,000, using the proceeds from a $600,000 loan that he in his individual capacity obtained from First Republic Bank ("First Republic"). As security for the First Republic loan, Crawford and Kamphaus gave First Republic mortgages on 339 and 343 Poplar Street, the two remaining properties.

According to Kampford's 2006 tax return, the LLC earned ordinary business income in 2006 of $49,014. This income was derived entirely from the sale of 349 Poplar Street, Kampford's only sale that year. Kampford's 2006 tax return again erroneously lists the remaining two Properties as assets of the LLC. Schedule K-1 to Crawford's 2006 federal income tax return, concerning his interest in Kampford, indicates that the beginning balance of his capital account in 2006 was $23,739, and that this balance increased during 2006 by $24,507, half of what Kampford earned on the sale of 349 Poplar Street. The same Schedule K-1 also indicates that Kampford made a distribution to him in 2006 of $25,000. Kamphaus's 2006 Schedule K-1, concerning his interest in Kampford, indicates that his beginning capital account in 2006 was $419,714 and that it increased by $24,507, half of what Kampford earned on the sale of 349 Poplar Street. Kamphaus's 2006 Schedule K-1 also shows a distribution from Kampford to him of $59,500.

On July 24, 2007, Cape Cod Lumber recorded in the Suffolk County Registry of Deeds a writ of attachment against Crawford's assets. This attachment was obtained in litigation unrelated to the Project or to Kamphaus, but it nonetheless encumbered the two remaining Properties, 343 Poplar Street and 339 Poplar Street. In order to prevent any hindrance to the progress of the Project, Kamphaus paid off the Cape Cod Lumber lien, the amount of which both Kamphaus and Crawford testified was approximately $49,000, and, on September 28, 2007, Cape Cod Lumber duly recorded a discharge of its real estate attachment. On account of Kamphaus's satisfaction of Crawford's obligation to Cape Cod Lumber, Crawford became obligated to Kamphaus or Kampford in the amount of the payment. Kamphaus and Crawford treated the obligation as a debt of Crawford to the LLC.[3] At the end of 2007, Crawford continued to owe this debt to the LLC. Also at the end of 2007, Crawford was further indebted to the LLC for an additional $9,000, the result of his having drawn approximately $20,000 on a Kampford line of credit for his personal use and his having repaid only $11,000 of the borrowed sum. Accordingly, for these two obligations of Crawford to the LLC, Kampford's 2007 tax return listed $58,917 "Due From Partner" as a current asset.

In September of 2007, Crawford and Kamphaus, as joint tenants, sold and conveyed title to the second of the three Properties, 343 Poplar Street, for the sale price of $554,900. Of this sum, Kamphaus used approximately $400,000 to pay down the First Republic loan and deposited the remainder into Kampford's bank account. Kamphaus himself paid off the balance of the First Republic loan; he funded this payment with the proceeds from a home equity line of credit in the amount of $250,000 that he personally obtained from First Republic, for which Kamphaus and his wife granted First Republic a mortgage on their residence. According to Kampford's 2007 federal income tax return, the LLC incurred

---

[3] It is not clear whether this treatment was appropriate. The evidence does not indicate whether Kamphaus treated his payment of the Cape Cod Lumber debt as a capital contribution to the LLC. If he did, then the payment would essentially have been made by the LLC, and it would be appropriate to treat Crawford's resulting obligation as one to the LLC. If he did not, then the obligation would be to Kamphaus himself. The evidence does not permit the Court to resolve this issue, but the magnitude of the obligation is not large enough for the treatment to affect the outcome of this proceeding.

6

a loss in 2007 of $18,220, which includes loss of $10,194 from the sale of 343 Poplar Street and additional loss of $6,377 on account of taxes and fees related to the Project.

Schedule K-1 to Crawford's 2007 federal income tax return, concerning his interest in Kampford, indicates that the beginning balance of his capital account in 2007 was $23,246 and that this balance decreased in 2007 by $9,058, about half of Kampford's loss for 2007.  The same Schedule K-1 also shows a distribution from Kampford to Crawford during 2007 of $476.  Kamphaus's 2007 Schedule K-1, concerning his interest in Kampford, indicates that the beginning balance of his capital account in 2007 was $384,721, that he contributed additional capital during the year of $204,708, and that the total was reduced by $9,059, about half of Kampford's 2007 loss, for an ending balance of $580,370.  This schedule shows no distribution from Kampford to Kamphaus during 2007.

For reasons unspecified, Crawford stopped work on the Project towards the end of 2007.  When he did so, the house at 339 Poplar Street was not in salable condition.  It required additional work, such as landscaping and electrical, which, at some unspecified time between Crawford's stopping work and the date of the trial in 2010, Kamphaus oversaw and spent approximately $6,500 of his personal funds to complete.  At the time of the trial, the home at 339 Poplar Street was vacant and listed for sale.

By a deed dated April 1, 2008, Crawford and Kamphaus, as joint tenants, conveyed the real property at 339 Poplar Street to Kamphaus for the stated consideration of one dollar "and other good valuable consideration paid."  (It is this transfer that the Trustee seeks by this adversary proceeding to avoid.)  By this conveyance, Crawford transferred his interest in the subject property to Kamphaus.  It is undisputed that 339 Poplar Street was unencumbered at the time of its transfer.

The precise value of 339 Poplar at the time of the transfer is unclear.  The evidence of value is from three sources.  First, in its 2007 federal income tax return, Kampford valued the property as of the end of 2007 at $536,321, but the court has no evidence as to the manner in which Kampford determined this value.  Second, according to an appraisal prepared by appraiser Marc S. Safner for First Federal Bank as of July 21, 2006, the property, which the appraisal notes was then "nearing

7

completion," had a fair market value of $600,000, but this value was expressly "subject to completion." Neither the appraisal itself nor other evidence indicates precisely how far from completion the property was at that time.  And third, at trial in 2010, Kamphaus, who at that time remained the owner of the property and had been marketing it for some time, stated that he initially marketed the property for the asking price of $539,000 but, as of the time of trial, had reduced the asking price to $499,000.  On the basis of this evidence, and figuring in the substantial weakening in the real estate market that occurred after the transfer, in the second half of 2008, on account of the credit crisis of that time, the Court is persuaded that the value used by Kampford in its tax return, $536,321 is a fair and reliable indicator of the property's fair market value as of April 1, 2008, the date of the transfer.  Of the three valuations in evidence, it is the valuation that comes nearest in time to the transfer, and it was made by the entity that knew the property best and knew how close it was to completion at the time.  It is also roughly consistent with the other valuations, one of which placed the value at $600,000 upon completion, and the other of which reflects reduced aspirations to reflect post-transfer changes in the real estate market and the economy.

At the time of the transfer, Crawford was indebted to Kamphaus and the LLC for four distinct obligations.  First, he was obligated to the LLC or to Crawford in the principal amount of $49,000 for the funds advanced by Kamphaus to pay off Crawford's debt to Cape Cod Lumber.  Second, he was obligated to the LLC  in the principal amount of $9,000 for funds he borrowed on the LLC's line of credit for his personal use.  Third, he was obligated to Kamphaus or the LLC, or perhaps both, for breach of his obligation under the Kampford Operating Agreement to complete his contracting and construction obligations on 339 Poplar.  The precise amount of this obligation is unclear, but the evidence indicates that Kamphaus hired others to complete Crawford's obligations for $6,500; to this I add $2,000 for Kamphaus's own time and effort, for a total estimated obligation of $8,500.

Fourth, and most significantly, he was obligated under the Kampford Operating Agreement, upon sale of 339 Poplar and dissolution of the LLC, to transfer the proceeds from the sale of his 50

8

percent interest in the property to Kamphaus to the extent necessary to effectuate the distribution required by Operating Agreement.[4]  The Operating Agreement required that the net proceeds, after payment of the expenses of the LLC, be divided between Crawford and Kamphaus in proportion to their respective capital account balances.  At the time, Crawford's balance was $13,712 and Kamphaus's was $580,370.  Their capital accounts therefore totaled $594,082.  Crawford's share constituted only 2.31 percent of this total, and Kamphaus's was the balance, 97.69 percent.  Kamphaus was therefore entitled to a distribution of 97.69 percent of the net value of the LLC, and the vast majority of the value of the LLC lay in 339 Poplar itself.   In fact, the only other asset of value of which the court has evidence is the LLC's receivables from Crawford.  To effect such a distribution, it would be necessary for Crawford to transfer to Kamphaus 95.38 percent of the proceeds of his (Crawford's) one-half interest in the property.

What, if anything, did Crawford receive in exchange for the transfer of his interest in the property?  Kamphaus testified about his understanding of the April 1, 2008 transfer, stating that the "other good valuable consideration paid" included Kamphaus's forgiveness of any liability of Crawford, either to him directly or to Kampford, for (i) Crawford's leaving the Project without completing the construction for which he was responsible and (ii) the approximately $58,000 aforementioned debt that Crawford owed to Kampford for Kamphaus's satisfaction of the Cape Cod Lumber lien and Crawford's personal use of the Kampford credit account.  Kamphaus also testified that the same transfer occurred pursuant to the Kampford Operating Agreement, citing his belief that the Operating Agreement contains a provision stating that if any member of Kampford finished a year with a negative capital account balance, that member was required to transfer his interest in any remaining Poplar Street properties to the member with a positive capital account balance.  The Court finds no such provision in the Kampford Operating Agreement; and although Crawford's capital account balance at the time was small, and

---

[4] At the time of the transfer, this debt had not matured—it would mature only upon sale of 339 Poplar—but the Bankruptcy Code defines debt to include even unmatured rights to payment.  11 U.S.C. §§ 101(5)(A) and 101(12) (defining "claim" as including an unmatured right to payment and "debt" as liability on a claim).

Crawford owed the LLC more than he would receive in a distribution of its net value, his capital account balance was not then negative. Nonetheless, on the basis of Kamphaus's testimony, I find that it was Crawford's and Kamphaus's intention that Crawford's transfer of his interest in 339 Poplar would and did effect a satisfaction and settlement of Crawford's various obligations to Kamphaus and the LLC, and these obligations totaled $322,271.48: $8,500 for Crawford's leaving the project prematurely; $58,000 for his obligations to the LLC; and $255,771.48 for 95.38 percent of the value of his one-half interest in 339 Poplar.

According to Kampford's 2008 tax return, the LLC incurred a total loss of $66,917, which includes a $58,917 loss on account of writing off the "Due From Partner" current asset as a bad debt and an $8,000 unspecified additional loss. Crawford's 2008 Schedule K-1 tax statement concerning his interest in Kampford, indicates that his beginning capital account balance in 2008 was $13,712 and that it decreased by $12,855. Crawford's 2008 K-1 also shows a distribution from Kampford to him personally of $857, which left his ending capital account at $0. Kamphaus's 2008 Schedule K-1 tax statement, concerning his interest in Kampford, indicates that his beginning capital account balance in 2008 was $580,370, that he contributed additional capital of $3,050 during the year, and that his capital account decreased by $68,532 over the course of the year. Kamphaus's 2008 K-1 shows a distribution from Kampford to him personally of $514,888, which left his ending capital account at $0. According to the testimony of Kampford's accountant, Kamphaus's tax basis in 339 Poplar Street is $514,888.

On November 18, 2008 (the "Petition Date"), Crawford and his wife, Rosemarie Crawford, filed a joint voluntary petition for relief under Chapter 7 of the Bankruptcy Code, thereby commencing the present bankruptcy case, and Joseph Braunstein was appointed the chapter 7 trustee. Crawford listed unencumbered assets on his bankruptcy schedules of $19,573.00, unsecured debts of $151,861.00, and deficiency claims on secured debts of approximately $124,000 more.[5] His unencumbered assets were

---

[5] Although Crawford and his wife filed a joint petition, the filing did not create a joint or consolidated estate, 11 U.S.C. § 302(b), and did not make him liable on his wife's sole obligations. For present purposes, the Court must

10

entirely subject to valid claims of exemptions, such that no portion was available for distribution to unsecured creditors. Crawford testified that his financial condition was substantially the same from the date of the transfer at issue until the time he filed his petition. No evidence was introduced of a significant change in his solvency between the date of the challenged transfer and the Petition Date.

**Discussion**

The Trustee seeks to avoid the transfer of 339 Poplar under 11 U.S.C. § 548(a)(1) as a fraudulent transfer and, in the alternative, under 11 U.S.C. § 547(b) as a preferential transfer. To the extent that a transfer is avoided under either § 547 or § 548 of the Bankruptcy Code, § 550(a) allows the trustee to "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property," from, amongst others, the "initial transferee." 11 U.S.C. § 550(a). Kamphaus concedes that he is the initial transferee of 339 Poplar Street.

    **a.   Fraudulent Transfer under § 548(a)(1)(B)**

Section 548(a)(1) of the Bankruptcy Code provides in relevant part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . .
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

11 U.S.C. § 548(a)(1). Here the Trustee, as the party seeking to avoid the transfer at issue, "bears the burden of proof on each element of entitlement to avoidance" and must discharge that burden "by a

---

and does count only those assets in which Crawford had an ownership interest, either on his own or jointly with his wife, but not those assets of which his wife was sole owner. Likewise, the Court must count only those of the scheduled obligations that are Crawford's, not those that are only his wife's.

preponderance of the evidence." *Burdick v. Lee*, 256 B.R. 837, 839-40 (D. Mass. 2001) (citing *McColley v. Jacobs (In re North American Dealer Group, Inc.)*, 62 B.R. 423, 428 (Bankr. E.D.N.Y. 1986); *Talbot v. Warner (In re Warner)*, 65 B.R. 512, 518-19 (Bankr. S.D. Ohio 1986)). The Trustee here must prove the following distinct elements: (i) that the transfer in question was of an interest of the debtor in property; (ii) that the transfer occurred on or within 2 years of the date of the filing of the petition; (iii) that the debtor received less than a reasonably equivalent value in exchange for the transfer; and (iv) that the debtor was insolvent on the date that such transfer was made or became insolvent as a result of the transfer. It is undisputed and obvious that the April 1, 2008 transfer at issue occurred within two years of November 18, 2008, the date Debtor filed his petition. The remaining three issues are in dispute.

### i. An Interest of the Debtor in Property

The first requirement of § 548(a)(1)(B)—and of § 547(b), the Trustee's alternate basis for relief, to which this analysis is equally pertinent—is that the transfer in question be a transfer "of an interest of the debtor in property." 11 U.S.C. §§ 548(a) and 547(b). Here, the undisputed evidence shows that the debtor, Crawford, owned an interest in 339 Poplar as a joint tenant, and that, by the joint deed of April 1, 2008, he and Kamphaus transferred this interest to Kamphaus. Standing alone, this evidence would satisfy the requirement that the interest transferred be "an interest of the debtor in property," and Kamphaus does not contend otherwise. Kamphaus maintains, however, that this evidence does not stand alone and that the circumstances in which Crawford held his ostensible interest in 339 Poplar require a determination that, at the time of the transfer, Crawford owned only bare record title and no economic interest in the property. Though the precise contours of his argument are unclear, Crawford appears to be arguing (1) that under applicable state law, the interest of one of two joint tenants in property is only presumptively a one-half interest, and that the presumption can be rebutted to show a different ratio or allocation of interests between the joint tenants, and (2) that in view of the Kampford Operating Agreement, the vast difference between his and Crawford's capital contributions to the

12

Project, and their respective capital account balances at the time of the transfer, the presumption that the joint tenants' interests were equal is rebutted, and Crawford's percentage interest in the property at the time of the transfer should be quantified at zero.[6]

Kamphaus cites no authority for the proposition that the interests of joint tenants can be unequal, and the Court is aware of none. Black letter law dictates that in order to create a joint tenancy, four unities must exist, among them the unity of interest, requiring that joint tenants have identical interests as to amount. *Knapp v. Windsor*, 60 Mass, 156 (1850) (joint tenants have the land by one joint title, from which derive the properties of a joint estate, among them unity of interest); *Cross v. Cross*, 324 Mass. 186, 189 (1949) ("If Thomas and William had taken as joint tenants, and nothing had been said as to the aliquot portion of their interests, they would have been equally entitled."); 14C Howard J. Alperin, MASSACHUSETTS PRACTICE SERIES, Summary of Basic Law § 15.28 (2010) (at common law, in order to create a joint tenancy, it is necessary that four unities exist, including the unity of interest, meaning that all joint tenants hold identical interests as to amount); BLACK'S LAW DICTIONARY (9th ed. 2009) (defining a joint tenancy as "[a] tenancy with two or more co-owners who take identical interests simultaneously by the same instrument and with the same right of possession"). For this reason, I reject Kamphaus's argument that Crawford had no interest of economic significance. As a joint tenant, his interest was equal in amount to Kamphaus's and therefore a one-half interest.

In the alternative, Kamphaus argues that 339 Poplar may be viewed as having been held "as a joint venture" between himself and Crawford. The Court rejects this possible view of the matter as inconsistent with two facts: that Kamphaus and Crawford chose to define their business relationship by

---

[6] Kamphaus's argument can be better understood by clarifying what he does *not* argue. Despite his recurring insistence that Crawford held only bare legal or record title, Kamphaus does not argue that Crawford should be deemed to have held the property in an actual trust for either himself or Kampford. He does not suggest, nor is there evidence, that an actual trust was ever established. Kamphaus does cite in passing, and without further development, case law as to the burden of proof for establishing the existence of a resulting trust. Insofar as this may constitute an argument that Crawford should be treated as having held the property subject to a resulting trust, the argument must be rejected for insufficient development. Nor does Kamphaus contend that the property should be treated as belonging to the LLC. Though they treated the property in many ways as if it did belong to Kampford, they also clearly knew that it did not, and the Court finds no support in the evidence for any suggestion that Kamphaus and Crawford intended for the property to belong to Kampford.

forming a limited liability company, not a joint venture; and that they arranged for title to the property to be held not by a separate business entity, whether the LLC or a joint venture, but by themselves as joint tenants. They neither formed a joint venture nor intended to do so.[7]

For these reasons, the Court concludes that the transferred interest, a full one-half was an interest of the debtor in property.

### ii. Insolvency

The Trustee must prove that the debtor "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation." 11 U.S.C. § 548(a)(1)(B)(ii)(I). The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). The Trustee proved Crawford's insolvency on April 1, 2008 by retrojection. Under the principle of retrojection, "where a debtor is shown to be insolvent at a date later than the date of the questioned transfer, and it is shown that the debtor's financial condition did not change during the interim period, insolvency at the prior time may be inferred from the actual insolvency at the later date." *In re Arrowhead Gardens, Inc.*, 32 B.R. 296, 301 (Bankr. D. Mass. 1983) (citing *Hassan v. Middlesex County National Bank*, 333 F.2d 838 (1st Cir. 1963); *Braunstein v. Massachusetts Bank & Trust Company*, 443 F.2d 1281 (1st Cir. 1971)).

Crawford indicated in the schedules of assets and liabilities that he filed in his bankruptcy case that, as of November 18, 2008, the Petition Date, he had unencumbered assets of $19,573.00, unsecured debts of $151,861.00, and deficiency claims on secured debts of approximately $124,000.00 more. No evidence was adduced to controvert this evidence of insolvency. Therefore, as of November 18, 2008, the Petition Date, Crawford was plainly insolvent. The allegedly fraudulent transfer occurred

---

[7] Moreover, even under this theory as articulated by Kamphaus, Crawford's transfer of his interest in 339 Poplar would be viewed as a transfer "of his interest in the joint venture" and therefore the transaction would still constitute a transfer of an interest of Crawford in property.

14

on April 1, 2008. Crawford testified that his financial condition was substantially the same from the date of the transfer at issue until he filed his petition. Kamphaus presented no evidence concerning a significant change in Crawford's assets or liabilities during the relevant period. The only change in evidence was the transfer itself, which effected a transfer of value of $268,160.50 and satisfied additional debt (to Kampford and/or Kamphaus), not reflected in the schedules, of reasonably equivalent value. Accordingly, the Court finds that Trustee has proven by a preponderance of the evidence that Crawford was insolvent on April 1, 2008, before the transfer was made, and that if he was not already insolvent when he made the transfer, he was at least rendered insolvent by the transfer.

### iii. Reasonably Equivalent Value

The Trustee must also prove that Crawford received "less than a reasonably equivalent value" in exchange for the transfer. In examining whether the Debtor received "reasonably equivalent value," "that value must pass a measurement test" under which the Court "must examine all aspects of the transaction in order to measure carefully the value of all of its benefits and burdens to the debtor, direct or indirect." *In re New Commonwealth Pub. Co.*, 118 B.R. 155, 163 (Bankr. D. Mass. 1990). The Court must determine the value of the asset transferred and the value of any consideration the debtor received in return; the Trustee must prove that the latter was less than "reasonably equivalent" to the former. For purposes of § 548, "value means property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). "Debt" is defined as "liability on a claim," 11 U.S.C. § 101(12), and "claim" in turn is defined as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, legal, equitable, secured, or unsecured," 11 U.S.C. § 101(5)(A).

The Court found above that, at the time of the transfer, the property had a fair market value of $536,321 and was unencumbered. The Court has further held that Crawford had a one-half interest in the property. Accordingly, the value of his transferred interest was $268,160.50. As I found above, this

15

transfer was made in satisfaction and settlement of Crawford's various obligations to Kamphaus and the LLC, which obligations totaled $322,271.48:  $8,500 for Crawford's leaving the project prematurely; $58,000 for his obligations to the LLC; and $255,771.48 for 95.38 percent of the value of his one-half interest in 339 Poplar.  In return for transfer of $268,160.50 Crawford received value of $322,271.48.  Therefore, he received reasonably equivalent value—in fact, more than reasonably equivalent value—and therefore the Trustee has not carried his burden of proof on this element and cannot prevail on his count under § 548(a)(1)(B).  The Court therefore turns to his alternative count under § 547(b).

      **b.**      **Preference under § 547(b)**

A Trustee may avoid transfers made by a debtor that are deemed preferential pursuant to § 547(b) of the Bankruptcy Code.  Section 547(b) in relevant part defines a preferential transfer as a follows:

> any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  In an action seeking to avoid a preferential transfer, "the trustee has the burden of proving by a preponderance of the evidence each of the elements prescribed in § 547(b)."  *In re First Software Corp.*, 107 B.R. 417, 420-21 (D. Mass. 1989)(citing *In re Utility Stationary Stores, Inc.*, 12 B.R. 170 (Bankr. N.D. Ill. 1981); *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 576 (1st Cir. 1980)).

The Court has already determined, in its rulings above on the count under § 548(a), that the transfer satisfies the first four requirements of § 547(b).  First, the transfer was a transfer of an interest of the debtor in property.  Second, the transfer was made to and for the benefit of Kamphaus, who was

a creditor of Crawford.  Third, the transfer was made for or on account of an antecedent debt, one Crawford owed before the payment was made.  And fourth, Crawford was insolvent at the time of the transfer.  As to each of these elements, I rely on the discussion above, without need to reiterate.

The next element, set forth in § 547(b)(4), is a requirement that the transfer have occurred within the applicable statutory look-back period.  Here the Trustee relies not on the generally available look-back period of 90 days from the date of the petition but on the extended period, set forth in § 547(b)(4)(B), of "between ninety days and one year before the date of the filing of the petition," which applies only where "such creditor"—that is, the creditor to whom or for whose benefit the transfer was made—"at the time of such transfer was an insider."  11 U.S.C. § 547(b)(4)(B).  The transfer undisputedly occurred between ninety days and one year before the date of the filing of the petition. The Court finds, and Kamphaus does not dispute, that, by virtue of their business relationship as co-owners of Kampford and parties to its Operating Agreement, Kamphaus was an "insider" within the meaning of 11 U.S.C. §§ 101(31)(A) (defining insider) and § 547(b)(4)(B).  Section 101(31)(A) of the Bankruptcy Code defines the term "insider" by supplying a non-exhaustive list of entities that constitute insiders.  In a case where the debtor is an individual, insider is defined to include a "general partner of the debtor."  11 U.S.C. § 101(31)(A).  Recognizing that the list of insiders in § 101(31) is not exclusive, and using that list as guidance, courts have held that "an insider may be any person or entity whose relationship with the debtor is sufficiently close to as to subject the relationship to careful scrutiny."  *In re Craig Systems Corp.*, 244 B.R. 529, 539 (Bankr. D. Mass. 2000) (internal citations and quotation marks omitted).  Effectively, "insider status is determined by a factual inquiry into the debtor's relationship with the alleged insider, including whether the debtor and the alleged insider dealt at arm's length."  *In re Craig Systems Corp.*, 244 B.R. at 539 (internal citations omitted).  Kamphaus and Crawford were the only two members and managers of Kampford, and the Kampford Operating Agreement defined their rights and obligations with respect to an asset, 339 Poplar, that was not an asset of Kampford but that Kamphaus and Crawford owned together as joint tenants.  On these facts, their relationship, albeit not a

17

partnership, was sufficiently like that of partners that Kamphaus should be deemed an insider. *Donahue v. Rodd Electrotype Company of New England, Inc.*, 367 Mass. 578 (1975) (stockholders in a close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another).

The last element, set forth in § 547(b)(5), requires a showing that the transfer enabled the creditor to receive more than he would have received in a chapter 7 liquidation had the transfer not been made. The Court found above that the transfer enabled Kamphaus to receive value of $268,160.50 on total debt of approximately of $322,271.48, a dividend of 83.2 percent. Had the transfer not been made, the trustee would have (1) liquidated the property for its fair market value of $536,321, (2) paid from this an estimated $26,000 broker's fee, (3) distributed half the net proceeds to Kamphaus for his one-half interest in the property, (4) from the balance paid further administrative expenses for his own commission and his accounting and legal fees, including the costs of prosecuting a complaint under 11 U.S.C. § 363(h), all of which I conservatively estimate at $30,000, and then (5) distributed the balance, approximately $225,160.50, on a pro rata basis in satisfaction of unsecured claims aggregating $598,132 [including listed unsecured claims of $151,861.00, deficiency claims on secured debts of approximately $124,000, and the debts to Kamphaus and/or the LLC of $322,271], for a dividend to Kamphaus of $121,315.68, or 37.6 percent of the amount of his claim. The Trustee has carried his burden on this element.

For these reasons, the Court holds that Crawford's transfer of his half interest in 339 Poplar Street is avoidable under 11 U.S.C. § 547(b) as a preferential transfer.

### d. Equitable Lien under § 550(e)(1)

Section 550(e)(1) of the Bankruptcy Code creates an equitable lien in favor of certain good faith transferees of property that a trustee recovers in an avoidance action. Kamphaus asserts that, if the

18

transfer to him is avoidable, he nonetheless holds such a lien on the interest the Trustee recovers.

Section 550(e)(1) provides as follows:

> A good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of
>
> > (A) the cost, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property and;
> >
> > (B) any increase of the value of such property as a result of such improvement of the property transferred.

11 U.S.C. § 550(e)(1). In his posttrial brief,[8] Kamphaus argues that he holds such a lien for two reasons: first, because in 2007, after the sale of 343 Poplar Street, he paid off the outstanding portion of the mortgage on both 343 and 339 Poplar Street owed to First Republic by using the proceeds from a home equity line of credit on his personal residence that he personally obtained from First Republic; and second, because he contributed approximately 93% of the capital for the development and construction of 339 Poplar. These facts constitute the sole grounds on which Kamphaus asserts the existence of a lien in his favor under § 550(e)(1).

      This argument cannot succeed because the "improvements" on which Kamphaus relies—the contribution of capital and the satisfaction of a mortgage encumbering 339 Poplar—were made before, not after, Crawford's 2008 transfer of his interest in 339 Poplar Street. By the express language of the statute, a lien under § 550(e)(1) must arise from improvements made after the avoided transfer. Kamphaus has therefore failed to establish that he holds a lien in any amount under § 550(e)(1).

---

[8] Kamphaus's first asserted a lien under § 550(e)(1), which it is his burden to assert and establish, not in his answer or even in the Joint Pretrial Memorandum but in his posttrial brief. Nonetheless, the Trustee does not oppose it as untimely, and for that reason neither will the Court deem it untimely.

**Conclusion**

On the basis of the foregoing considerations, the Court will avoid the transfer under § 547(b), deny relief under § 548(a) to the Trustee, and deny any lien rights under § 550(e)(1) to Kamphaus. A separate judgment will enter accordingly.

Date: June 30, 2011

_____
Frank J. Bailey
United States Bankruptcy Judge